IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JERMAINE WILLIAMS,** | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.   2:17-cv-02697-RBS |
| **CITY OF PHILADELPHIA OFFICE** | : | |
| **OF THE SHERIFF, ET AL.,** | ; | |
| | : | |
| Defendants, | : | |

**STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

Defendants, City of Philadelphia Office of the Sheriff ("CPOS"), Deputy Sheriff Victor Lopez, and Deputy Sheriff Javier Velasco, by and through their undersigned counsel, hereby submit the following undisputed material facts in support of summary judgment on all claims against them:

1. Chief Inspector Joseph Evans[1] ("CI Evans") has been in charge of the CPOS Transportation Unit ("the TU") for nearly eight years.  (Exhibit A, Deposition of CPOS Designee Chief Inspector Joseph Evans, July 19, 2019, at 82:14-21.)

2.  The TU is responsible for the transportation of inmates from prisons in Pennsylvania to the Criminal Justice Center  ("CJC") in Philadelphia for court appearances.prisoners.  (Exhibit B, Declaratin of Deputy Velasco, September 11, 2019, at ¶ 7; Exhibit C, Declaration of Deputy Lopez, September 11, 2019, at ¶ 7.)

---

[1] CI Evans is paid at the rank of Captain but has the title of Chief Inspector.

3. The CPOS policy for prisoner transport, in pertinent part, is as folows:

II. POLICY

    A. A Deputy Sheriff with the Philadelphia Sheriff's Office shall conform to the following policy.

        1. The Unit Commander, or designee, shall be responsible for the transportation of prisoners.

        2. The Unite Commander, or designee, shall implement transport procedures that ensure the safety of the public, transporting deputies and prisoners and that the rights of the prisoners are safeguarded.

        . . . .

        7. b) Deputies shall give special care and consideration to prisoners who are physically handicapped.

(Exh. A at 9:18-19, Exhibit 2 thereof at D-14[2].)

4. The type of van inmates in wheelchairs are transported in is equipped to secure the wheelchair to the floor and a seat belt and shoulder harness to secure the inmate into his wheelchair. (Exh. A at 12:1-25, 13:1-25, 14:1-11; Exh. B at ¶¶ 11, 19, 20; Exh. C at ¶¶ 11, 19, 20.)

5. This type of van has been used for decades by the TU. (Exh. A at 6:17-19, 38:8-22.)

6. As Unit Commander of the TU, CI Evans implemented a practice of giving written instructions to deputies transporting inmates in wheelchairs to use the equipment in the van to strap down the wheelchair and to seatbelt the inmate to the wheelchair. (Exh. A at 8:20-25, 9:1-9; Exh. B at ¶¶ 12-13; Exh. C at ¶¶ 12-13.)

---

[2] Referring to the Bates page number of the Exhibit.

7. All deputies transporting inmates confined in wheelchairs are mandated by CI Evans, as the Unit Commander of TU, to follow the procedure of securing the wheelchair to the floor and secure the inmate in the wheelchair with the seatbelt. (Exh. A at 30:23-25, 31:1-5; 69:1-17.)

8. All deputies assigned to the TU undergo on-the-job training and every newly assigned deputy transporting inmates is accompanied by an experienced deputy to ensure the proper use of the equipment to safely secure a wheelchair-bound inmate. (Exh. A at 38:23-25, 39:1-25, 40:1-4, 40:24-25; Exh. B at ¶¶ 9-11; Exh. C at ¶¶ 9-11.)

9. Instructions on how to use the equipment in a van accessible to inmates in wheelchairs are in the driver's manual, and all deputies are given visual instruction on how to safely secure an inmate in a wheelchair in the van. (Id.)

10. The procedure for transporting a wheelchair-bound prisoner in a CPOS van is as follows:

   a) The prisoner is wheeled out to the van.

   b) He is wheeled onto the van's lift and the wheelchair's wheels are locked.

   c) A belt is engaged across the lift to ensure the wheelchair does not come off the lift.

   d) One officer will be on the platform level of the van while another officer operates the lift controls from the gound.

   e) Once at the platform level, the wheels are unlocked and the officer inside the van wheels the prisoner to one of the five locations inside the van that accommodates wheelchairs.

   f) Once in position, the wheelchair is secured to the floor of the van with four heavy duty hooks and canvas straps.

   g) Then the prisoner is secured in the wheelchair with a combination lap and shoulder strap and belt that connects to the top, right rear clamping device.

(Id. at 12:5-25, 13:1-24.)

11. The belt and shoulder harness functions identically as a passenger vehicle seat belt and harness. (Id. at 13:17-24.)

12. Failure to properly secure a wheelchair-bound inmate in the van is a violation of the CPOS directive and practice, subject to disciplinary action. (Exh. A at 69:15-22; Exh. B at ¶ 14; Exh. C at ¶ 14.)

13. If there is an incident involving injury to an inmate during transportation, the incident must be reported by the deputy, and failure to report will result in severe disciplinary action. (Exh. A at 78:20-25, 79:19-25, 80:1-4; Exh. B at ¶ 15; Exh. C at ¶ 15.)

14. If a deputy provides false information to a supervisor investigating a transportation incident, he is subject to discipline. (Exh. B at ¶ 16; Exh. C at ¶ 16.)

15. From January 6, 2014 through June 28, 2019 1,145 inmates in wheelchairs were transported by the CPOS. (Exh. A at 74:20-25, 75:1-10 and Exhibit 5 thereof.)

16. From January 6, 2014 through June 28, 2019, there were three reported transportation incidents involving wheelchair-bound inmates, including Jermaine Williams' incident on November 14, 2016. (Id. at 75:20-25, 76:3.)

17. Out of those three incidents, only two of the inmates went to the hospital, including Jermaine Williams. (Id. at 70:17-25, 71:1-2.)

### *The Transporation Incident on November 14, 2016*

18. On Monday, November 14, 2016, Deputy Velasco and Deputy Lopez were assigned to pick up inmates at SCI-Graterford to transport to the CJC. (Exh. B at ¶ 17; Exh. C at ¶ 17.)

19. They were informed by their supervisor that one of the inmates, Jermaine Williams ("IM Williams"), was in a wheelchair. (Exh. B at ¶ 18; Exh. C at ¶ 18.)

20. They were assigned to van S-918, which is a van that accommodates inmates who are confined in wheelchairs. (Exh. B at ¶ 19; Exh. C at ¶ 19.)

21. Six photos attached to the deputies' declarations accurately depict the outside and inside of van S-918. (Exh. B and Exh. C at ¶ 20.)

22. The deputies also were assigned to transport eight other inmates who were not in wheelchairs on the same trip from SCI-Graterford to the CJC. (Id. at ¶ 21.)

23. They left the TU lot at between 5:00 a.m. and 6:00 a.m. to drive to SCI-Graterford. (Id. at ¶ 22.)

24. The route they took from the TU lot, which is on State Road in Philadelphia, was on local traffic routes from State Road to Rhawn Street, to Church Road, to SCI-Graterford. (Id. at ¶ 23.)

25. Church Road is also known in part as State Route 73, which at various stretches has different names, including Skippack Pike. (Id. at ¶¶ 24-25.)

26. The stretch of Route 73 that is Skippack Pike takes you to SCI-Graterford. (Id. at ¶ 25.)

27. The trip from the TU lot to SCI-Graterford takes over an hour, depending on traffic. (Id. at ¶ 26.)

28. Upon arriving at SCI-Graterford, the deputies went to the sally port or receiving room of the prison to process the inmates they were transporting to the CJC. (Id. at ¶ 27.)

29. This took over an hour, and included strip searching all the inmates, first securing IM Williams in the van, and then escorting the other inmates into the van.  (Id. at ¶ 28.)

30. IM Williams and his wheelchair were secured by Deputy Velasco with the help of a supervisor from SCI-Graterford, while Deputy Lopez kept watch on the eight other inmates.  (Id. at ¶ 29.)

31. To secure him in the van, Deputy Velasco lifted up the chair that comprises seats 5 and 6 and a supervisor from SCI-Graterford assisted him by wheeling IM Williams onto the wheelchair lift and into the van.  (Exh. B at ¶ 30 and Photos 4-6 depicting location of seats 5 and 6.)

32. Once inside the van, Deputy Velasco secured the wheelchair using the floor brackets in the area where seats 5 and 6 are located.  (Id. at ¶ 31 and see Photo 5, "FLOOR BRACKET.")

33. IM Williams was in the wheelchair at all times as Deputy Velasco did this, and the wheelchair was secured to the floor with IM Williams facing the front of the van.  (Id. at ¶ 32 and Photo 6.)

34. Deputy Velasco then secured the shoulder and lap belt, securing not only the wheelchair but also IM Williams.  (Id. at ¶ 33.)

35. After IM Williams was secured inside the van, Deputy Lopez escorted the eight other inmates into the van.  (Exh. C at ¶ 30.)

36. After all the inmates were secured inside the van, they left SCI-Graterford at around 8:00 a.m.  (Exh. B at ¶ 34; Exh. C at ¶ 31.)

37. The trip took about 2 hours because, as usual, local traffic was heavy the whole way to the CJC.  (Exh. B at ¶ 35; Exh. C at ¶32.)

38. The route they took to the CJC from SCI-Graterford was Perkiomen Creek Road to State Route 113, right onto Route 113, then left back onto Perkiomen Creek Road to State Route 29, left on Route 29 to Ridge Pike, and continued on Ridge Pike through Norristown, to Philadelphia, where it becomes Ridge Avenue. (Exh. B at ¶ 36; Exh. C at ¶ 33.)

39. In Philadelphia, Deputy Velasco continued drivng on Ridge Avenue to Henry Avenue, to Hunting Park Avenue, to Kelly Drive, up Benjamin Franklin Parkway to Arch Street, right onto 15th Street, around Penn Square (where City Hall is located), to the Juniper Street entrance of the CJC receiving garage. (Exh. B at ¶ 37; Exh. C at ¶ 34.)

40. As the recorder, Deputy Lopez sat in the seat on the cab side of the first partition between him and the inmates in the first row, with his seat facing the driver's side of the cab. (Exh. C at ¶¶ 35-36, and see Photo 6.)

41. During the trip, Deputy Lopez visually checked on the inmates from time to time. (Id. at ¶ 37.)

42. At no time during the trip from SCI-Graterford to the CJC did Deputy Lopez hear any inmated complain about the way Deputy Velasco was operating the van. (Id. at ¶ 38.)

43. Van S-918 is a very wide van and it is not safe to travel at high speeds in the van, which is why Deputy Velasco drove on local routes to the CJC from Graterford. (Exh. B at ¶ 38 and see Photos 1-3.)

44. As the van approached Arch Street, traffic was very heavy from there to Penn Square, and as usual, traffic around Penn Square was very heavy. (Exh. B at ¶ 39; Exh. C at ¶ 39.)

45. The traffic was so heavy around Penn Square, Deputy Velasco would be surprised if he had reached 5 m.p.h. driving around City Hall. (Exh. B at ¶ 40.)

46. Deputy Velasco drove the van around City Hall in Penn Square and at the light at Market Street and Penn Square, on the east side of City Hall, an inmate alerted Deputy Lopez that IM Williams had fallen off his wheelchair. (Exh. B at ¶ 41; Exh. C at ¶ 40.)

47. Deputy Lopez immediately notified a supervisor at the CJC that IM Williams had fallen off his wheelchair. (Exh. B at ¶ 42; Exh. C at ¶ 41.)

48. Deputy Velasco activated the van's lights and siren and proceeded to the Juniper Street entrance of the CJC, which is located about 150 feet from the Market Street traffic light. (Exh. B at ¶ 43; Exh. C at 42.)

49. When they arrived at the CJC receiving garage, a supervisor, Sergeant Steve Korpalski was waiting for them and SGT Korpalski had already contacted Fire Rescue. (Exh. B at ¶ 44; Exh. C at ¶ 43.)

50. The deputies exited the van and went downstairs to the cell block area of the CJC to do our paperwork regarding the incident involving IM Williams. (Exh. B at ¶ 45; Exh. C at ¶ 44.)

51. Other deputies and SGT Korpalski took over processing the inmates who were in the van and IM Williams was transported to Hahnemann Hospital. (Exh. B at ¶ 46; Exh. C at ¶ 45.)

52. At no time during the trip from SCI-Graterford to the CJC did Deputy Velasco exceed the speed limit or suddenly stop the van; and neither deputy knows how or why IM Williams fell off his wheelchair, or when he undid the seatbelt securing him in his wheelchair. Deputy Velasco knows he had secured IM Williams at SCI-Graterford. (Exh. B at ¶ 47; Exh. C at ¶¶ 46-47.)

53. It's not unusual for inmates to undo their seatbelts while traveling. (Exh. C at ¶ 47.)

54. The incident was investigated by Chief Inspector Joseph Evans. (see Exh. A at 54-69 and Exhibit 4 thereof at D-1 – D-6.)

55. In his investigation, based on uncontroverted information he received from Deputy Velasco and Deputy Lopez and his observation of the wheelchair inside the van at the CJC, he concluded "Williams was securely seatbealted to his chair and his chair secured to the floor with straps.  He removed his seatbelt at some point between the prison and the courthouse.  [He] noted that [Williams] had traveled in the vehicle for in exccess of one hour and was within minutes of arriving at the Justice Center before taking himself out of the chair."  ((Id., Exhibit 4 at D-2.)

56. Chief Evans did not interview the inmates who were passengers in the van because he "thought they would have said whatever they thought would have kept them in good stead with another inmate they have to serve time with."  (Id. at 68:6-12.)

                                        Respectfully Submitted:

                               BY:    */s/ Matthew K. Hubbard*
                                          MATTHEW KEVIN HUBBARD
                                          Senior Attorney
Dated:  September 20, 2019            Attorney for Defendants