STUART M. NIEMTZOW, ESQUIRE
806 Darby Road
Havertown, PA 19083
(610) 449-2111
stuartnlaw@gmail.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

JERMAINE WILLIAMS, :

Plaintiff :

: No. 2:17-cv-02697-RBS

CITY OF PHILADELPHIA Et. Al. :

Defendants :

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT,

## ARGUMENT

### I. THE LAW CONCERNING SUMMARY JUDGMENT

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v.*

*Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

II. THE CENTRAL, "ELEPHANT IN THE ROOM" DISPUTE OF MATERIAL FACTS IN THIS CASE

The central, dispositive issue in this case is and has always been whether the defendant deputy sheriffs properly seat belted/harnessed plaintiff and his wheelchair within the van. [1] A secondary, but relevant material dispute is whether the same defendants properly secured the other prisoners in the van, and why two prisoners ended up on top of plaintiff. Both of these material disputes have permeated this case, and continue to do so, and are issues for a jury to decide. The City's claim that these issues are "undisputed" is the predicate for any relief under its Motion for Summary Judgment. [2]

While it is true that the City has never taken the deposition of the plaintiff, and, therefore, beyond what he averred in his Amended Complaint, the record is devoid of plaintiff's sworn version of the incident at issue, clearly, the City acknowledges the law that allows such a plaintiff to establish a bona fide dispute of material fact "by his own affidavits or declarations"[3]. Indeed, plaintiff—in his attached Declaration-- has done just that in response to the City's Motion, confirming the long at-issue dispute in this case which formed the basis for plaintiff's Complaint and theory of liability: that he was not secured or harnessed in any meaningful manner in the City van trip at issue; likewise, the two prisoners who fell violently on top of plaintiff and his wheelchair, were, equally unsecured. Essentially, the situation in the van, in plaintiff's description, was akin to

---

[1] The City acknowledges that, as a matter of law, a "failure to provide a seatbelt to a prisoner while driving in a manner that puts a prisoner at risk of injury can constitute deliberate indifference to a prisoner's health and safety", citing Brown v. Fortner, 518 F. 3rd 552, 558 (8th Cir. 2008), cited at City Brief p. 5. Thus, the factual dispute about whether the plaintiff was properly secured is "material": if a factfinder finds that the plaintiff was not secured, it can then impose the liability at issue in this Motion against the deputies, and, against the City, upon proof of inadequate guidelines, training, etc. on that issue.

[2] As this Court held earlier, in ruling on defendants' Motion to Dismiss, failure to properly secure/seatbelt/harness can legally constitute an 8th Amendment violation under decided caselaw. It is , moreover, the "law of the case" as to this instant Motion. Williams v. City of Philadelphia Office of the Sheriff, 2017 WL 3602518, at *4 (E.D.Pa., 2017). The City does not dispute that such a claim is valid under the 8th Amendment in this case.

[3] City Brief at p. 3.-4..

**multiple ball bearings being thrown around a chamber, with nothing to restrain their movement. Although that situation might sound innocuous, it is essential to keep in mind that plaintiff was previously suffering from spinal cord injuries, seizures and other ills, rendering him particularly vulnerable and in need of protection, which is why he was in the wheelchair in the first place. A determination of how—or even whether—plaintiff or the prisoners who fell on him were secured is the key predicate factual determination in this case, and will be at trial.. This is particularly so as the two deputies involved have seemingly claimed that plaintiff was fully and adequately secured.[4] Plaintiff's declaration, attached to this Opposition, as Exhibit "1", confirms the material dispute of facts in this case, which precludes summary judgment. Plaintiff confirms, inter alia, that:**

- **He was not, in any way, secured to his wheelchair by the deputies;**
- **His wheelchair, itself, was not properly secured to the van itself, as it "jumped" up during the trip.**
- **That no effort was made by the City to prevent the other inmates in the van from becoming "human projectiles" during the trip.**
- **That any claim or suggestion that he "unharnessed himself" from proper seat/shoulder belting is purely exculpatory speculation on the part of the defendants; that there was no reason, among other things, or motivation for plaintiff to do so, had he been properly secured.**

---

**[4] The City makes no such claim for the two prisoners who fell on plaintiff during the incident, however. In fact, the City cannot make such a claim, as its designee deponent confirmed that such prisoners were never, in fact, secured by deputies, as the City had no practice to do so. (See, Exhibit "A" to the City's motion, p, 20: 1-23, wherein Captain Evans – incredibly-- confirmed that how the non-wheelchair prisoners were secured to their seats was almost totally up to those prisoners; ("If they chose to, they could use the seatbelts. It's their choice…if they choose to use them they can use them.") In other words, the City had no policy to secure them, and the deputies, therefore, took no steps to secure those prisoners. Astonishingly, as a result , those prisoners became human projectiles. It is no surprise that two of them were launched on top of plaintiff during the incident at issue, and were found on top of him.`**

These are factual issues, which must be decided by a finder of fact to even analyze the legal claims made in the City's Motion.

## III. SUMMARY OF THIS CASE

This is a civil rights case. The plaintiff, alleges that he was not at all secured to his wheelchair during the trip from Gratersford to the Criminal Justice Center in Center City and, as a result of the forces inside the van, due to the driving and the lack of thorough seat belting, he was thrown violently out of his wheelchair, likely suffered a seizure, lost consciousness, and awakened to find two prisoners on top of him. Confirming that this is totally inconsistent with his being properly secured, according to City policy, the City's Rule 30 (b)(6) designee on the subject testified that , if properly secured by the deputies, "If that truck were to be on its roof, that wheelchair will stay—that wheelchair will be in place". (Exhibit "A" to the City's Motion, at p. 13-15.) In the instant case, the truck was not on its roof and never was, yet the plaintiff was thrown from his wheelchair into the wall of the van and suffered a seizure". [5]At the very least, this raises a bona fide dispute of material fact as to whether the City properly or adequately—if , at all—secured him within the van. In fact, it seems to be *prima facie* evidence that the prisoner was not properly secured at all. [6] The incident would not have even happened had he been properly secured for the conditions of the trip in the motor van.

## IV. LIABILITY

If the jury was to decide that , in this case, the City failed to adequately secure plaintiff to his wheelchair and the wheelchair to the van, then the City could be liable as to <u>all</u> claims discussed in the instant Motion: failure to supervise the deputies (there was no supervision on this trip); failure to train them how to properly secure the plaintiff, and failure to properly drive the van consistent with the safety ramifications of a

---

[5] The City designee (Exhibit "A" p. 37: 10-18)) in fact acknowledged that the City would expect the wheelchair inmate to be "still in the wheelchair" if properly secured, though the City would anticipate, astonishingly, that the "rest of them [the passengers] will be on the floor".

[6] The City, however, has contrived a ridiculous explanation for plaintiff's trajectory: that he released his restraints on his own for some implausible reason. The City's Motion and the statements of the deputies involved keeps hammering this ridiculous claim, without any good faith evidentiary basis. Not only does that contention inarguably <u>create</u> a dispute of material fact in this case, but it is a claim that is purely based on "conjecture" the City designee acknowledged.

**wheelchaired inmate's needs. [7]Either the inmate was insufficiently secured for the forces the deputies created inside the van during the motor vehicle trip or the forces were so negligently or recklessly created, that they overcame and negated the purported proper securing of plaintiff. The only other explanation is the one the City repeats and repeats, that the plaintiff, for some unimaginable reason, decided to remove the secure seatbelts/harness on his own, thereby causing his own injury. The City has no evidence whatsoever to substantiate this theory , and would not at trial, as there is none.**

**This latter claim borders on ludicrous, as no one saw or has any reason to believe the plaintiff removed his harness, as opposed to never being placed into it properly. It is based on no motivation of plaintiff to do so. In fact, the City designee himself, conceded that any such claim was just "a conclusion" he made during his investigation after the incident; that no one saw the plaintiff "disengage" his harness. (Exhibit "A", p. 60). Moreover, this "conclusion" itself was merely speculative, as there are only two possible causes of the injuries to plaintiff here: that plaintiff "disengaged" the seatbelt/harness or that he was never even placed into it. [8]**

---

**[7] It has long been the law of this Circuit that a government actor's failure to act upon recognizing an obvious "vulnerability" constitutes "reckless indifference" to their safety. That someone is in a wheelchair confirms an obvious vulnerability to injury, as it confirms a pre-existent condition warranting wheelchair transportation. See, e.g., Colburn v. Upper Darby Tp., 946 F.2d 1017, 1023 (C.A.3 (Pa.),1991) where the vulnerability was to suicide. It is submitted that a prisoner in a wheelchair is even more open and obvious evidence that he/she was particularly vulnerable to injury or re-injury.**

**[8] In addition to being purely conjecture in this case, without any scintilla of evidence, even this conjecture is polluted by the City's failure to even interview any of the multiple prisoners in the van after the incident. At trial, plaintiff will seek to estop the City from making this unfounded and ludicrous explanation for plaintiff's injuries on a "spoliation" related theory for failure to investigate and, therefore, preserve dispositive evidence. See, e.g., Victor v. Lawler, 2012 WL 1642603, at *1 (M.D.Pa.,2012)**

A. The City is Liable Under Monell Here

A plaintiff must prove that the County's actions – or inactions-through their policies or customs were "the moving force behind" the injuries.[9] The Third Circuit explained the plaintiff's burden:

> To establish liability based on a municipal policy or custom, the plaintiff must demonstrate the municipality was "the 'moving force' behind the injury alleged" by showing that there was a "direct causal link between the municipal action and the deprivation of federal rights." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed. 2d 626 (1997).

Stanley v. City of Pittsburgh, 467 Fed. Appx. 132, 133, (C.A.3 (Pa.) 2012)

Significant to the instant motion the issue of "the casual link", i.e., "causation" is a question of fact for the factfinder/jury.

> Ultimately, whether a policy or custom caused a deprivation of a plaintiff's rights is a question of fact for the jury. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

As the Supreme Court elaborated in Jett:

> *[I]*t is for the jury to determine whether their [policymakers'] decision have caused the deprivation of rights at issue by policies which affirmatively command that it occur ... or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.

---

[9] There is some confusion in the law as to whether the County policies have to be "the" or "a" "moving force". However, given the elaboration by the U.S. Supreme Court and by the Third Circuit Court of Appeals, that "distinction" is not significant.

> a governmental entity is liable under §1983 only when the entity itself is a "moving force" behind the deprivation, Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting Monell supra, 436 U.S., at 694, 98 S.Ct., at 2037); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.

*Kentucky v. Graham, 105 S.Ct. 3099, 3105, 473 U.S. 159, 166 (U.S. Ky., 1985) [emphasis added] See, also, e.g., Whichard v. Cheltenham Township, No. 95-3969, 1966 WL 502281, *5 (E.D.Pa. 1996) (citing Bielevicz, 915 F.2d at 850) (a custom or practice could be a "cause" of an injury if it caused or "contributed to the alleged constitutional injury").*

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1480-81 (C.A.3 (Pa.) 1990)[emphasis added}* This is similar to the law expressed by the Third Circuit in Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003):

> the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.' Id. at 417-18, 117 S.Ct. 1382 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989);

In other words, sometimes the likely consequences of, for example, as in this case, not having a policy to effectively mandate a safe method of transporting a vulnerable, wheelchaired prisoner despite the "obvious" risks the policy—or lack of policy----- creates – without further analysis- liability.

## V. Although The Dispositive Factual Dispute Precludes Summary Judgment Here, Plaintiff Briefly Responds To The City's Brief's Arguments, Nevertheless.

### A. The City's Policies, Procedures, Guidelines, Supervision, Training, etc. Have Created Chaos both in this Case and in General Concerning Transporting Wheelchair Prisoners.

Plaintiff took the City's Rule 30(b)(6) designee's deposition, pursuant to his Notice of Deposition, Exhibit "A" to the City's brief. As is evident from the following excerpts from that deposition [10] In sum, it is obvious that the Sheriff had no intelligible policy concerning the safe transportation of wheelchair prisoners. Therefore, it had no basis to train its deputies or create written materials for their guidance on the issue. The result was pure chaos. If a prisoner were properly secured, i.e., able to withstand the tipping over of a sheriffs van and remain secured, it was purely by chance. The deputies had no guidance or supervision that was, in any sense, institutional. At best, the Sherriff depended on the personal involvement of Captain Evans.

---

[10] The City Designated Captain Joseph Evans, from the Sheriff's office to testify on its behalf. All citations are to that deposition transcript, which is attached as Exhibit "A"

**Captain Evans testified that:**

- **"We have no specific directive that dictates [how to properly secure a prisoner being transported in a wheelchair]". [Dep. 8:13-9:9]**
- **"What we do have is a general directive that says "special care and consideration will be given to people that are handicapped." [Dep. 8:13-9:9][11]**
- **There is nothing else "in writing" to guide deputies on proper securing of wheelchair prisoners." [Dep. 10:11-17]**
- **In fact, there were no procedures at all concerning the transportation of prisoners in the same van with a prisoner in a wheelchair. [Dep. 11:2125]**
- **The proper way to secure a wheelchair prisoner was to use a lap and shoulder harness belt; there would then be no way a prisoner "could come out." [Dep.14: 5- 15:17]**
- **Not only was their no directive for using lap or harnesses on non-wheelchair prisoners in the same van, but "it's up to the prisoner himself" to determine how to secure himself in the van, if at all. The only way they are secured is by doing it themselves; otherwise, they are "free floating" , i.e., sitting on a bench, handcuffed, attached to no one or nothing. [Dep. 20:1- 22:1]**
- **The deputies should seatbelt a wheelchair prisoner into a wheelchair; the prisoner has no option. [Dep. 23: 11-20]**
- **The only written guideline, in fact, actually allows deputies to <u>not</u> seatbelt/harness a wheelchair prisoner in his chair. [Dep.26:10-15]**
- **Captain Evans believes that every wheelchair prisoner should be "belted" into a wheelchair. [Dep. 28:4-11]**
- **The only way guidance in the Sherriff's office is provided to deputies on safe belting is if they are personally "told", "instructed" by Captain Evans. [Dep. 30: 14- 31:7][12]**
- **The defendants anticipate that if a van tips over, etc. the non-wheelchaired prisoners "would wind up on the floor". [Dep. 36:3-37:17][13]**
- **There is "no standard operating procedure that trains deputies" how to secure people in wheelchairs. [Dep. 41:1-5]**
- **The only written guideline "envisions" someone without a seat belt in a wheelchair". [Dep. 41: 18-23]**

---

**[11] Plaintiff submits that this only written "directive" is unintelligible, and, therefore, meaningless as a guideline or policy for informing Sheriff's deputies about how to properly secure wheelchaired prisoners.**

**[12] Plaintiff submits that this confirms that the practices of the sheriff were haphazard at best; arguably "chaotic", as it depended on one man's being present at every such situation. On days when that employee was off, no one was responsible. And, as Captain Evans testified, he was "never" present at a State prison when the inmates were secured for the ride to Philadelphia courts, as is the case here. [See, Dep.31: 15-32:7] Furthermore, there were never any supervisors at Graterford to supervise the securing of the prisoners in Sheriff's vans. [Dep 50: 16-23]**

**[13] This is precisely what plaintiff alleges happened to him here: he was thrown from his wheelchair and two prisoners fell on top of him.**

<u>The Post- Accident "Investigation" [14]Here</u>:

- Was conducted by Captain Evans [Dep. 54: 13-56-18]
- The only thing Capt. Evans did to "investigate" was to speak to the deputies and read their statements"; he spoke to none of the prisoners in the van. [Dep. 56: 19-57:2]
- In the report, Captain Evans wrote " when the vehicle was two blocks from the courthouse, the deputies were alerted by other prisoners in the vehicle that a prisoner had fallen out of his wheelchair." [57:22-58:20]
- Captain Evans wrote that the plaintiff "removed his seatbelt between the prison and the courthouse". [Dep. 59:20-60:9]
- Though Captain Evans initially claimed that he got this information from talking to the deputies and reading their reports", he admitted that this was not in any of them and that it was his "conclusion", only. [Dep. 60:17-61:7]
- Captain Evans testified that if plaintiff had been properly seat belted, absent "disengaging the seatbelt/harness himself", he should not have been able to fall out of his wheelchair. [Dep. 65:12-17]

B. <u>The Negligence Claim is Fact-Dependent</u>

The negligence claim here can only be resolved by resolving the factual issue of whether plaintiff had ever been properly harnessed into his wheelchair. Since it is confirmed that he "fell out" of his chair near City Hall, the only possible explanation is that , using a moving motor vehicle, defendants failed to safely deliver plaintiff to his destination – the CJC. Any allegation, made by Captain Evans, that plaintiff somehow disengaged his seatbelt, is purely an exculpatory conclusion drawn in his report by Captain Evans. [15]Captain Evans had not a scintilla of evidence to confirm his conclusion—either from the passengers or the deputies. Since he did not question the prisoners, on that subject, plaintiff, will seek to estop the City from so alleging or even suggesting that plaintiff disengaged himself.[16]

[14] Plaintiff submits that this "investigation" was a "whitewash" here, either intentionally or carelessly rendered so.

[15] Captain Evans admitted that there was no such evidence, i.e., that any such claim was purely exculpatory speculation. See, above,. Nevertheless, the City, in this Motion, repeats and repeats this absurd speculation, as if Captain Evans had not so admitted.

[16] Not only does plaintiff maintain he never disengaged his seatbelt, but "logically" there was no reason for him to have done so; no motivation. The only result was a downside: he was sitting in the wheelchair unsecured and very vulnerable to just what happened to him. This contention is ludicrous, in addition to being totally unfounded. Moreover, the City did not even inquire about this baseless theory in its "investigation".

Thus, there are only two possible explanations for finding plaintiff thrown from his wheelchair with two prisoners on top of him: either he was never secured into that wheelchair or the movement inside the van from the method of driving was sufficient to overcome those purported harnesses—or both. In other words, the only plausible explanations both implicate the City.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment and enter the attached proposed Order.

Respectfully submitted,

STUART M. NIEMTZOW, ESQUIRE

October 8, 2019